**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patricia Murray, a married woman, | No. CV 08-1094-PHX-SRB |
| Plaintiff, | **ORDER** |
| vs. | |
| Principal Financial Group, Inc., a Delaware corporation; Principal Life Insurance Company, an Iowa corporation; Princor Financial Services Corporation, an Iowa corporation, | |
| Defendants. | |

Pending before the Court is Defendants Principal Financial Group Inc., Principal Life Insurance Company, and Princor Financial Services Corporation's ("Defendants") Motion for Summary Judgment ("Defs.' Mot.") (Doc. 50).

**I.  BACKGROUND**

This case arises under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-17, and contains claims for gender discrimination and retaliation. Defendant Principal Financial Group, Inc. is a global financial company offering a wide range of financial products and services, including annuities, disability income, 401(k) plans, mutual funds, and life and health insurance. (Defs.' Mot. at 2.) Defendant Principal Life Insurance Company is a subsidiary of the Principal Financial Group and sells life insurance. (*Id.*)

Defendant Princor Financial Services Corporation is also a subsidiary of Principal Financial Group, and it is a retail broker-dealer. (*Id.*) Plaintiff Patricia Murray is a Career Agent with Principal. Ms. Murray holds a Bachelor of Science degree and a Master of Science degree from Southern Illinois University, and she has contracted with Principal as a Career Agent since 1996, when she first signed the Career Agent's Contract DD713. (*Id.* at 3; Defs.' Statement of Facts in Supp. of Defs.' Mot. ("DSOF"), Ex. 3, Murray Dep. 42:4-18, 75:11-14; Ex. 4, Career Agent's Contract, at PFG000203.)

Plaintiff and other Principal Career Agents sell Principal products, except in limited circumstances when they sell non-Principal products through another brokerage. (DSOF, Ex. 3, Murray Dep. 26:19-27:2.) Most of Plaintiff's clients come through Principal's Union Alliance Program, "a targeted marketing initiative in which Principal developed expertise to serve union members and their needs regarding retirement program investments." (DSOF ¶ 74; Ex. 8, Selberg Dep. 17:18-22.) Principal selects those career agents who will be included in the Union Alliance Program, and Plaintiff could opt out if she chose not to participate. (DSOF, Ex. 3, Murray Dep. 31:12-17.) Plaintiff's income from the Union Alliance Program accounts for "anywhere from 90 to 98 percent" of her annual income. (*Id.* at 31:21-25.)

Defendants have moved for summary judgment on all of Plaintiff's claims, arguing that she is an independent contractor (not an employee), and therefore she does not enjoy the protection of Title VII. The Court heard oral argument on Defendants' Motion on July 13, 2009.

**II.     LEGAL STANDARDS AND ANALYSIS**

    **A.     Summary Judgment**

The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of Civil Procedure. Under Rule 56, summary judgment is properly granted when: (1) no genuine issues of material fact remain; and (2) after viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). A fact is "material" when, under the

governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

### B. Employee v. Independent Contractor

Under Title VII, it is illegal for an employer

> **(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> **(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). Title VII only protects employees, not independent contractors. *See* 42 U.S.C. § 2000e(f) ("The term 'employee' means an individual employed by an employer . . . ."); *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999) (explaining that one of Congress's objectives in enacting Title VII was "to achieve equality of employment opportunities," and therefore requiring an employee-employer relationship for the protections of the statute to apply). If Ms. Murray cannot establish that she was an employee of the Defendants, her claims will be barred. Many courts have considered the question at stake here, generally concluding that insurance agents are independent contractors. *See, e.g.*, *Weary v. Cochran*, 377 F.3d 522, 524 (6th Cir. 2004) ("[T]his Court has repeatedly held that

insurance agents are independent contractors, rather than employees, in a variety of contexts." (citations omitted)); *Wortham v. Am. Fam. Ins. Group*, 385 F.3d 1139, 1140-41 (8th Cir. 2004) (determining that the plaintiff was an independent contractor); *Barnhart v. N.Y. Life Ins. Co.*, 141 F.3d 1310, 1313 (9th Cir. 1998) (considering all the common law agency factors "as a whole" and concluding that insurance agent was an independent contractor and not an employee, for the purposes of ERISA and the ADEA); *Birchem v. Knights of Columbus*, 116 F.3d 310, 313 (8th Cir. 1997) ("[F]ederal courts have consistently held that insurance agents are unprotected independent contractors."); *U.S.E.E.O.C. v. Catholic Knights Ins. Soc.*, 915 F. Supp. 25, 30-31 (N.D. Ill. 1996) (concluding that insurance agents were independent contractors and noting that the plaintiffs had "not cited one case where an insurance agent was found to be an employee").

Courts use several tests to determine whether a person is an employee or an independent contractor. The Ninth Circuit Court of Appeals has considered three options, but has not definitively ruled to use one over the others: (1) the "common law agency" test; (2) the "economic realities" test; and (3) the multi-factor "common law hybrid" test. *Sibbald v. Johnson*, 294 F. Supp. 2d 1173, 1175-76 (S.D. Cal. 2003) (citing *Lopez v. Johnson*, 333 F. 3d 959, 963 (9th Cir. 2003); *Vizcaino v. U.S. Dist. Ct. for W. Dist. of Wash.*, 173 F.3d 713, 723-24 (9th Cir. 1999); *Spirides v. Reinhardt*, 613 F.2d 826, 830-33 (D.C. Cir. 1979)).

The Supreme Court has explained that the common law agency test focuses on "the hiring party's right to control the manner and means by which the product is accomplished." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). Other factors relevant to this analysis are

> ". . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Id.* at 323-24 (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989)). The second test was explained by the Ninth Circuit Court of Appeals in *Adcock*: "Determining whether a relationship is one of employment or independent contractual affiliation requires a fact-specific inquiry which depends on the economic realities of the situation." 166 F.3d at 1292 (quotations and citations omitted). The primary factor in the "economic realities" test is the extent of the employer's right to control the means and manner of the worker's performance." *Id.* (citing *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 (9th Cir. 1980)). The Ninth Circuit Court of Appeals held,

> Other factors relevant to the inquiry include, but are not limited to: the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or by a specialist without supervision; whether the employer furnishes the equipment used and the place of work; the method of payment; whether the employer pays social security taxes; the manner in which the work relationship is terminated; and the intention of the parties.

*Id.* (citing *Lutcher*, 633 F.2d at 883 n.5). The third method, the common law hybrid test, combines the economic realities test with an evaluation of "the extent of the employer's right to control the means and manner of the worker's performance." *Lutcher*, 633 F.2d at 883.[1] In determining whether someone is an employee or an independent contractor, all the factors must be considered together, and no single factor is dispositive. *See Barnhart*, 141 F.3d at 1313.

---

[1] Other factors considered in the hybrid test include:
(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i. e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the work accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.
*Lutcher*, 633 F.2d at 883 n.5 (citations omitted).

The following facts are undisputed, based on the evidence viewed in the light most favorable to Plaintiff. Plaintiff's employment agreement from 1996 classifies her as an independent contractor. (DSOF, Ex. 4 at PFG000200.) While instructive and certainly reflective of the parties' intentions, this fact alone does not dispose of the Court's inquiry. *See Adcock*, 166 F.3d at 1293 (language in a contract "though not dispositive, reflects the parties' intention that Adcock would have been an independent contractor, not an employee"). The Career Agent's Contract DD713 also states, "You will be free to exercise your own reasonable judgment in marketing our policies, including the choice of time, place and manner of sale, but you are to conform to all of our rules, requirements and instructions not inconsistent with this relationship." (DSOF, Ex. 4 at PFG000200.) This description is also useful in ascertaining the parties' intentions at the time of contracting, September 1, 1996, but it does not end the analysis.

Under any test, the employer's right to control the manner and means of the person's work and actual day-to-day control of the person's work are crucial factors. The Career Agent's Contract DD713 obligates Plaintiff to "[c]onform to and comply with all of [Principal's] policies and procedures, including, but not limited to those regarding ethics requirements and prohibited outside activities." (DSOF, Ex. 4 at PFG000200.) The same agreement also requires that Plaintiff "[c]omply with [Principal's] instructions regarding the marketing and servicing of policies" and that she not "[u]se any sales material, software, supplies or advertising other than supplied by [Principal]." (*Id.* at 000200-000201.) These policies do establish that Defendants have the right to control Plaintiff's work to some extent.

However, upon closer examination, Defendants' actual control over the means and manner of Plaintiff's work appears to be relatively slight. In her deposition, Plaintiff testified that she is free to arrange her own schedule, purchase her own office supplies, and direct the actions of her assistant.[2] (DSOF, Ex. 3, Murray Dep. 27:3-12, 129:1-130:22, 164-22-165-5;

---

[2] Plaintiff was also free to select her own assistant and determine how he was paid. (DSOF, Ex. 3, Murray Dep. 18:12-19:9.) Her assistant, who is also Plaintiff's husband, did

- 6 -

*see also* PSOF, Ex. T, Murray Dep.) Plaintiff is not entitled to vacation or sick days, as a Career Agent. (DSOF, Ex. 3, Murray Dep. 165:4-5.) Plaintiff is also free to choose where she works, is not required to work from the Principal office, and in fact, rents her own office space in Tempe, Arizona. (DSOF, Ex. 2, Castellani Dep. 55:14-56:4; DSOF, Ex. 3, Murray Dep. 17:16-20, 121:3-122:3.) If a Career Agent elects to work from the Principal office, he or she is charged rent for space and must pay to use Principal support staff. (DSOF, Ex. 1, Swanson Dep. 35:9-17.) Plaintiff also testified that while she sells predominantly Principal products, she has "a handful" of clients who required other products, and she is able to service those clients through the Principal Product Network, which sells non-Principal products. (DSOF, Ex. 3, Murray Dep. 26:2-27:2.) Plaintiff purchased much of the office furniture and equipment in her office herself (and depreciates it on her tax returns), but Defendants provided her with a desk, a chair, grease boards, and file cabinets. (*Id.* at 73:12-75:1.) Career Agents lease computers from Principal. (*Id.* at 115:20-21; DSOF, Ex. 1, Swanson Dep. 37:19-25.)

Plaintiff argues that Defendants had the right "to come into a Career Agent's office at any time – announced or unannounced – to review any records, papers, or computers. They have the right to monitor, via software, anything Plaintiff is doing." (Pl.'s Resp. at 7.) Defendants respond that the purpose of these policies is to ensure compliance with federal regulations. (Defs.' Reply at 8.) Also, Robert Castellani, Regional Managing Director and Plaintiff's superior at Principal, testified in his deposition that in his time in that position, he had never gone into any agent's office to review or access any records. (PSOF, Ex. R, Castellani Dep. 47:9-12.) Plaintiff also points out several areas in which Defendants exercise more detailed control over her actions. Principal prints Plaintiff's business cards and approves their appearance. (DSOF, Ex. 3, Murray Dep. 55:19-20, 123:12-19.) Also, Career Agents are permitted to put together websites advertising their services, but the websites

---

need to be cleared by Principal and undergo a background check, in order to comply with federal regulations. (DSOF, Ex. 1, Swanson Dep. 46:11-20.)

1  must be run by one of a list of Principal-approved vendors and must be approved by Principal
2  for compliance with insurance regulation, consistency, and to be sure that all websites have
3  a common "look and feel." (PSOF, Ex. R, Castellani Dep. 64:9-65:15.)

4  Mr. Castellani testified that Plaintiff receives a relatively limited amount of
5  supervision as a Career Agent. Mr. Castellani stated that his role with respect to Career
6  Agents like Plaintiff is to "make sure that the Principal name is being represented properly,"
7  to "mak[e] sure that customers or clients are being serviced properly," and to "mak[e] sure
8  that [Principal's] reps or agents are working within the guidelines of the insurance and
9  securities guidelines." (DSOF, Ex. 2, Castellani Dep. 34:25-35:13.) Mr. Castellani testified
10 that to accomplish these goals, he receives records of written correspondence between Career
11 Agents and clients on a monthly basis, and he reviews advertising materials. (*Id.* at 35:18-
12 36:20.) Mr. Casetellani also reviews a log of incoming checks. (PSOF, Ex. R, Castellani Dep.
13 60:7-15.) When Ms. Murray submits advertising materials for review, they are approved
14 "with or without changes" and given a time frame in which they can be used. (DSOF, Ex. 2,
15 Castellani Dep. 48:7-22.) Mr. Castellani also testified that Career Agents set their own sales
16 goals, and he sees his role as "to be a coach to help them get to those goals." (*Id.* at 38:6-21.)
17 Mr. Castellani stated that there is no difference in his supervision of "713 agent[s]" and "715
18 broker[s]." (*Id.* at 42:15-21.)[3] If a problem arises between two Career Agents, it is their
19 responsibility to resolve it; only if they are unable to resolve it will the Regional Managing
20 Director intervene. (DSOF, Ex. 1, Swanson Dep. 27:6-12.) Ms. Murray testified that in the
21 two weeks prior to her deposition, she had contacted Mr. Castellani twice, via e-mail, and
22 had not spoken to him on the telephone. (DSOF, Ex. 3, Murray Dep. 127:17-128:4.) Plaintiff

---

[3] Plaintiff devotes a portion of her Response to distinguishing DD713 Career Agents from DD715 brokers. (Pl.'s Resp. at 3-5.) However, this argument is not pertinent to the issue at hand, because, as Defendants point out, "[a]n insurance company may maintain two separate kinds of contractual relationships with its independent contractors without turning one of those relationships into an employment relationship." (Defs.' Reply at 4.)

was required to attend one mandatory annual training session through Principal, which covered compliance with laws and regulations related to insurance. (*Id.* at 131:12-132:1.)

As a Career Agent, Ms. Murray is eligible for benefits through Principal, including health insurance, dental insurance, retirement plans, pension plans, and 401(k) options. (*Id.* at 54:13-55:2.) Ms. Murray takes part in Principal's 401(k) program, and Principal matches her contributions. (*Id.* at 98:13-18; DSOF, Ex. 11.) Principal does not pay any portion of Murray's monthly premium payments for medical, dental, vision or long-term disability coverage, although the plan is subsidized because it is a group plan. (DSOF, Ex. 3, Murray Dep. 99:5-21; *see also* DSOF, Exs. 10-11.) Principal classifies Career Agents as statutory employees for tax purposes, in order to make available this menu of benefits. (DSOF, Ex. 2, Castellani Dep. 25:11-20.) Pursuant to this designation, Social Security and Medicare taxes can be withheld from the wages of statutory employees, and they may also be allowed to participate in group pension and benefit plans. (Defs.' Mot. at 5 (citing 26 U.S.C. §§ 3121(d), 7701(a)(20); Department of the Treasury, Internal Revenue Service, *Employer's Supplemental Tax Guide*, Publication 15-A (2009)).) Employees have access to the same benefits as those available to statutory employees (Career Agents), but employees also choose from a wider range of options, some of which are not open to statutory employees. (*See*, DSOF, Exs. 10-11.)

Principal reported Plaintiff's commissions to the Internal Revenue Service ("I.R.S.") for the years 2001-2008 on W-2 forms as a statutory employee. (*See*, DSOF, Ex. 14.) Principal withheld Social Security and Medicare taxes from Plaintiff's commission wages on her W-2 forms, but not federal or state income tax. (*Id.*) Plaintiff reported the W-2 wages from her commissions on Schedule C of form 1040 as business income. (*See, e.g.*, DSOF, Ex. 15 at 0952.) Plaintiff received a form 1099 for her agent expense allowance, which is additional money paid to agents by Principal to be used in the agent's business and is based on production levels. (DSOF, Ex. 2, Castellani Dep. 80:21-81:5; Ex. 3, Murray Dep. Ex. 16.) In the 2001-2008 tax years, Plaintiff deducted a variety of items as business expenses in her filings with the I.R.S., including car and truck expenses, insurance, office expenses, rent,

legal and professional services, travel, meals and entertainment, continuing education, marketing, gifts, postage, professional memberships, telephone expenses, publications, furniture, and fixtures. (DSOF, Ex. 15.) On her tax returns, Plaintiff also reported that she was self-employed at her company, Murray Financial. (*Id.*; DSOF, Ex. 3, Murray Dep. 54:17-21.)

Examining all the factors involved in the various tests and the evidence in the record and viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff is an independent contractor. While some factors weigh in favor of employee status, such as Plaintiff's long relationship with Principal and her access to benefits, those facts are outweighed by her independence, both functionally and financially, and the clearly-defined intentions of the parties. Plaintiff works in her own office, which she chose, and she determines when and how to do her job. While Plaintiff has contact with Principal employees and other agents, they do not direct the means and manner of her work beyond ensuring compliance with laws and regulations and ensuring consistent representation of Principal products.[4] The Career Agent contract gives Principal the right to ensure that Plaintiff meets company standards when she does her job, and Defendants retain the right to enter and inspect Plaintiff's office, but in practice, this control has never been exercised to a degree that would transform Plaintiff from an independent contractor into an employee. Plaintiff sets her own schedule and is only required to attend periodic compliance meetings and to discuss her sales goals with Principal employees. Moreover, Plaintiff has taken advantage of her status as an independent contractor by deducting her business expenses on her tax returns and filing as a self-employed taxpayer. She is paid based on her commissions, rather than

---

[4] Simply requiring Plaintiff to comply with laws and regulations related to insurance (a heavily-regulated industry) does not rise to the level of control an employer has over an employee. Courts have concluded as much in a variety of scenarios. *See, e.g.*, *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 230 (2d Cir. 2008) (observing that "policies that merely reflect professional and governmental regulatory standards may not typically impose the kind of control that marks an employment relationship" (citing *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 262 (4th Cir. 1997))).

drawing a salary. As a statutory employee, she is entitled to benefits, but this does not mandate a finding here that she is an employee for purposes of Title VII. *See, e.g.*, *Weary*, 377 F.3d at 527 (6th Cir. 2004) (finding that the fact that an insurance salesman was classified as a statutory employee for tax purposes weighed in favor of the conclusion that he was an independent contractor, *not* an employee). In sum, Plaintiff has a great deal of freedom to determine the day-to-day workings of her employment, and Defendants do not exert enough control over her to rise to the level of an employer-employee relationship.

## III. CONCLUSION

Because the Court concludes that Plaintiff is an independent contractor and not an employee, she is not protected by Title VII, and Defendants are entitled to summary judgment on her claims for gender discrimination.

**IT IS THEREFORE ORDERED** granting Defendants' Motion for Summary Judgment (Doc. 50).

**IT IS FURTHER ORDERED** directing the Clerk to enter judgement in favor of Defendants.

DATED this 14th day of July, 2009.

_____
Susan R. Bolton
United States District Judge